UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEXANDER SIGAL,

                       Plaintiff,

          -v-

METROPOLITAN LIFE INSURANCE
COMPANY,

                     Defendant.

16-CV-3397 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Alexander Sigal brings this action against Defendant Metropolitan Life

Insurance Company ("MetLife") for wrongful denial of disability benefits pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The

parties have filed cross-motions for summary judgment. (Dkt. Nos. 51, 60.) For the reasons that

follow, MetLife's motion is granted in part, and Sigal's cross-motion is denied.

## I.     Background

Plaintiff Alexander Sigal worked as a computer programmer at Barclays Bank PLC

("Barclays") from September 2000 to September 2008. (Dkt. No. 64 ("Pl. CSOF") ¶ 1; Dkt. No.

62 ("Pl. SOF") ¶¶ 7–8; Dkt. No. 71 ("Def. CSOF") ¶¶ 7–8.) The computer programmer job at

Barclays required "high level sharp cognitive functioning, high level energy, motivation, interest,

multitasking, ability to problem solve . . . [,] self-confiden[ce], and [a] personable manner of

interacting [with] others," as well as "focus, concentration," organization, working at a rapid

pace, and emotional stability. (Dkt. No. 52-2 at 85, 199.[1]) Barclays established and maintained

---

[1]     Page numbers refer to Bates Numbers and are preceded in the record by "SIGAL
000."

a Group Long-term Disability Plan ("the Plan"), which is an employee welfare benefits fund regulated by ERISA. (Pl. CSOF ¶ 2, 4.) Sigal was a participant in the Plan, and MetLife insured the Plan and administered claims for benefits under it. (Pl. CSOF ¶¶ 3, 5–6.)

In September 2008, Sigal stopped working for Barclays due to symptoms of major depression, including a severe episode that required hospitalization. (Pl. SOF ¶ 11; Def. CSOF ¶ 11; Dkt. No. 52-2 at 66–69.) On October 10, 2008, following his hospitalization, Sigal filed a claim for short-term disability benefits. (Pl. SOF ¶ 20; Def. CSOF ¶ 20.) A claim specialist from MetLife consulted with Sigal's treating psychiatrist, Dr. Ernst Kayne, who informed MetLife that Sigal's depression was severe and that his symptoms worsened after his discharge from the hospital. (Pl. CSOF ¶¶ 13, 15.) Dr. Kayne also reported that Sigal's Global Assessment of Functioning ("GAF")[2] score was low (ranging from 25 to 50, with an average of 45-50) and that Sigal was experiencing suicidal ideation. (Pl. CSOF ¶ 19; Dkt. No. 52-2 at 72–73.) Based on Dr. Kayne's report and records, MetLife approved Sigal's initial claim for short-term disability benefits on November 2, 2008. (Pl. CSOF ¶ 24.)

During MetLife's review of Sigal's claim for continuing short-term disability benefits, Dr. Kayne completed a psychiatric questionnaire, in which he diagnosed Sigal with major depression. (Pl. CSOF ¶¶ 25–26.) Based on that questionnaire and a claimant interview with Sigal, MetLife approved Sigal's claim for continuing short-term disability benefits through December 12, 2008. (Pl. CSOF ¶¶ 36, 39.) MetLife continued to approve benefits through the maximum short-term disability benefit period ending on April 3, 2009. (Pl. CSOF ¶¶ 49, 51.)

---

[2] GAF is 100-point scale used by clinicians to measure a patient's psychological, social, and occupational functioning. *See, e.g.*, *Hickman v. Colvin*, No. 12 Civ. 288, 2014 WL 652545, at *5 n.4 (E.D.N.C. Feb. 19, 2014).

On May 12, 2009, Sigal's claim was transferred to MetLife's long-term disability ("LTD") unit for review. (Pl. CSOF ¶¶ 51, 58.) As part of the LTD review process, MetLife conducted another claimant interview and received another psychiatric questionnaire from Dr. Kayne. (Pl. CSOF ¶¶ 59–60, 68.) Dr. Kayne reaffirmed his diagnosis of depression and stated that Sigal's depressive symptoms, general instability, and paranoid, delusional, and suicidal ideations left him "disabled due to an inability to work and function." (Pl. CSOF ¶ 69.) MetLife referred Sigal's medical records to a Psychiatric Clinical Specialist, who determined that his initial claim for LTD benefits was medically supported. (Pl. CSOF ¶¶ 71–72.) On this basis, MetLife approved Sigal's claim for LTD benefits on August 7, 2009, but it informed him that his claim may be limited by the Plan's "Mental Disorder Limitation," which caps lifetime benefits at twenty-four months for disabilities due to mental or nervous disorders.[3] (Pl. CSOF ¶ 81.)

On August 11, 2009, MetLife also informed Sigal that he was entitled to apply for Social Security Disability Insurance ("SSDI") benefits. (Pl. CSOF ¶ 82.) Sigal filed a claim for SSDI in September, which was eventually approved. (Pl. CSOF ¶¶ 83, 90.)

On October 21, 2009, MetLife conducted an updated claimant interview with Sigal. (Pl. CSOF ¶ 84.) MetLife also requested updated clinical information and a new psychiatric questionnaire from Dr. Kayne. (Pl. CSOF ¶ 91.) Dr. Kayne provided an updated diagnosis of bipolar disorder, and stated that Sigal's symptoms were "markedly severe, unstable, disabling, and interfered with [his] well-being, ability to function adequately and work." (Pl. CSOF ¶¶ 92, 96.) Based on Dr. Kayne's questionnaire and the assessment of the Psychiatric Clinical Specialist, MetLife approved Sigal's claim for continuing LTD benefits. (Pl. CSOF ¶ 101.)

---

[3]    The Plan's Mental Disorder Limitation "limits benefits on claims related to Major Depression, but expressly excludes from this limitation claims related to Bipolar Disorder." (Dkt. No. 56 at 8 n.5.)

In June 2010, MetLife requested updated clinical information from Dr. Kayne. (Pl. CSOF ¶ 110.) On August 9, 2010, Dr. Kayne provided a new psychiatric questionnaire in which he confirmed that Sigal's condition had not changed. (Pl. CSOF ¶ 111.) He reported that Sigal continued to experience "depressed mood, negative thinking, feelings of hopelessness and helplessness, low self-esteem, insomnia, paranoid ideation, [and] emotional instability." (Pl. CSOF ¶ 113.) MetLife's Psychiatric Claims Specialist conducted another claimant interview with Sigal, during which he similarly affirmed that his symptoms had not improved. (Pl. CSOF ¶ 117.) Based on this information, MetLife determined that Sigal remained unable to work. (Pl. CSOF ¶ 120.) In November 2011, MetLife conducted another claimant interview and reviewed more updated clinical information from Dr. Kayne with the same result: MetLife concluded that Sigal remained unable to work. (Pl. CSOF ¶¶ 129, 134, 142.)

On June 6, 2012, MetLife continued its review of Sigal's claim with another updated claimant interview. (Pl. CSOF ¶¶ 144–45.) Sigal also informed MetLife that Dr. Kayne had retired and that he would look for a new treating psychiatrist. (Pl. CSOF ¶¶ 148–49.) On July 2, 2012, Sigal submitted another psychiatric questionnaire completed by his new treating psychiatrist, Dr. Irina Kiblitsky. (Pl. CSOF ¶ 150.) Although Dr. Kiblitsky did not find Sigal's symptoms to be as severe as Dr. Kayne had found them to be (e.g., she stated his GAF score was 65-70, while Dr. Kayne's gave him a score of 45 (Pl. CSOF ¶¶ 26,151)), MetLife determined that, because Sigal had seen this new doctor only twice, she needed more time to evaluate his capacity to return to work. (Pl. CSOF ¶¶ 156–57.) Therefore, MetLife continued to approve Sigal's claim for LTD benefits while planning to obtain updated medical records from Dr. Kiblitsky in three months. (Pl. CSOF ¶ 158; Dkt. No. 52-2 at 251–52.)

On December 6, 2012, Dr. Kiblitsky provided an updated psychiatric questionnaire, in which she reported a GAF score of 45-50 and a primary diagnosis of bipolar disorder, most recent episode depressed. (Pl. SOF ¶¶ 182–83; Def. CSOF ¶¶ 182–83.) She also described Sigal's condition as "easily irritable, annoyed by people, [with] a mostly depressed mood, negativistic attitude, apathy, [and] hopelessness." (Dkt 52-13 at 596.) She concluded that his return-to-work date was indeterminate. (Pl. SOF ¶ 187; Def. CSOF ¶ 187.)

In January 2013, MetLife received and reviewed Dr. Kiblitsky's office visit notes from June 28, 2012, to December 28, 2012. (Pl. CSOF ¶ 162.) Her notes from Sigal's June 28, 2012, office visit indicated that he appeared neat and clean, behaved appropriately and cooperatively, demonstrated normal psychomotor activity, spoke articulately, and displayed a congruent mood with a coherent and goal-oriented thought process. (Pl. CSOF ¶ 163.) Her notes through July are substantially similar, and also state that Sigal was "not internally preoccupied," and had no suicidal ideations. (Dkt. No. 52-12 at 565; Pl. CSOF ¶¶ 169, 171.) According to Dr. Kiblitsky's notes, Sigal's presentation remained relatively stable through the end of 2012, and her diagnosis of "Bipolar Disorder I, Most Recent Episode Depressed, severe without psychotic features" remained the same. (*See* Dkt. No. 52-11 at 541–58; Dkt. No. 52-12 at 559–77.)

MetLife referred Sigal's claim for further review by a Psychiatric Claims Specialist on January 16, 2013. (Pl. CSOF ¶ 199.) Later that month, the Specialist conducted an updated claimant interview with Sigal, during which she described Sigal as depressed and irritable, with slow speech. (Pl. CSOF ¶¶ 200, 203.) Sigal stated that he could not work due to mood swings and because he gets argumentative and agitated easily; he also reported experiencing memory problems and difficulty concentrating. (Pl. CSOF ¶¶ 201–02.) The Specialist, however, did not observe any impairment related to concentration. (Pl. CSOF ¶ 204.) Based on that interview and

Dr. Kiblitsky's medical records, the Specialist was not convinced that Sigal was unable to perform the duties of his "own occupation" and planned to seek clarification from Dr. Kiblitsky.[4] (Pl. CSOF ¶ 206.)

MetLife's Psychiatric Claims Specialist twice contacted Dr. Kiblitsky in March 2013 to discuss Sigal's treatment and current condition. (Pl. CSOF ¶¶ 207, 210.) Because Dr. Kiblitsky had to cut both conversations short, the Specialist ultimately sent her a psychiatric questionnaire to complete instead. (Pl. CSOF ¶¶ 209, 213–14.) On April 8, 2013, MetLife received the completed questionnaire, which diagnosed Sigal with bipolar disorder and gave him a GAF score of 60-70. (Pl. CSOF ¶ 215.) Dr. Kiblitsky stated that Sigal's return-to-work date was "unknown," and identified the following symptoms as most problematic for Sigal: "mood instability, irritability, angry outbursts . . . [and] difficulty tolerating/communicating with people." (Dkt. No. 52-10 at 532.) The Psychiatric Claims Specialist then referred Sigal's claim to MetLife's Psychiatric Medical Director for review to determine whether the available clinical information supported Sigal's claimed disability. (Pl. CSOF ¶ 220.)

Based on the Medical Director's review, MetLife decided to retain an Independent Physician Consultant, Dr. Lee H. Becker, a board-certified psychiatrist, to determine whether the available clinical evidence supported Sigal's inability to work. (Pl. CSOF ¶¶ 221–22.) Dr. Becker issued a report on April 23, 2013, in which he concluded that Sigal's medical records did not support "significant, global psychiatric functional limitations to preclude occupational functioning from the present forward." (Dkt. No. 52-10 at 521; Pl. CSOF ¶ 224.) MetLife faxed

---

[4]    In relevant part, the Plan defines "disabled" as "unable to earn . . . more than 80% of [claimant's] Predisability Earnings at [his] Own Occupation from any employer in [his] Local Economy." (Dkt. No 52-1 at 19.)

this report to Dr. Kiblitsky on April 30, 2013, and requested that she indicate whether she agreed with its findings, and if not, to provide clinical information supporting her contrary conclusions. (Pl. CSOF ¶ 232.)

Dr. Kiblitsky responded to MetLife by fax on May 9, 2013, and provided updated medical records.[5] (Pl. CSOF ¶ 234.) She reported that Sigal "mostly suffer[ed] from mood instability [and] irritability," but that he was "on the way" to better functioning. (Dkt. No. 52-8 at 497.) Based on a review of this report, Dr. Becker's report, and the other medical evidence, MetLife's Psychiatric Claim Specialist concluded that the evidence no longer supported Sigal's inability to work. (Pl. CSOF ¶ 241.) Consequently, MetLife terminated Sigal's claim for continuing long-term disability benefits on June 20, 2013, and informed him of his right to an administrative appeal. (Pl. CSOF ¶¶ 242, 249.)

In October 2013, Sigal filed an administrative appeal. (Pl. CSOF ¶ 250.) In support of his appeal, he attached a letter from Dr. E. Gagan and Clinical Social Worker Marina Feldman, both of the Maimonides Medical Center's Department of Psychology. (Pl. CSOF ¶ 252.) Sigal had become a patient at Maimonides on August 28, 2013. (Pl. CSOF ¶ 253.) The letter from Maimonides diagnosed Sigal with bipolar disorder, gave him a GAF score of 55, and listed symptoms including depressed mood, markedly diminished interest in almost all activities, sleep problems, psychomotor retardation with episodes of restlessness, loss of energy, and diminished ability to think of concentrate. (Dkt. No. 52-7 at 483; Pl. CSOF ¶ 256.) Gagan and Feldman concluded that these symptoms caused "clinically significant distress," resulting in "serious

---

[5]     The copy of Dr. Kiblitsky's May 9, 2013, letter to MetLife appears to have been partially cut off by the fax machine. (Dkt. No. 52-8 at 497.)

impairment in all areas of functioning," and that Sigal would be unable to work for at least six months. (Dkt. No. 52-7 at 483–84.)

Sigal's file, including the documentation from Maimonides, was then referred to MetLife's Appeal Unit, where it was reviewed by an Appeal Specialist. (Pl. CSOF ¶¶ 258–59.) The Appeal Specialist next referred Sigal's records to one of MetLife's Psychiatric Clinical Specialists to determine whether Sigal remained disabled beyond June 20, 2013, or whether MetLife should involve an Independent Physician Consultant in the review process. (Pl. CSOF ¶ 260.) Ultimately, Sigal's records were referred to an Independent Physician Consultant, Dr. Nicole R. Johnson. (Pl. CSOF ¶¶ 261–62.)

On December 6, 2013, MetLife received Dr. Johnson's report, which was based on her review of Sigal's medical records and her conversations with Drs. Kiblitsky and Gagan. Dr. Kiblitsky told Dr. Johnson that she had treated Sigal on June 23, July 15, July 24, August 21, and August 27, 2013, and that Sigal's main problem was "irritability" and "being unable to tolerate people." (Dkt. No. 52-6 at 477.) According to Dr. Johnson, "Dr. Kiblitsky did not notice any cognitive or memory problems," nor did she observe anything in his presentation that would "support him being unable to work." (*Id.*) Dr. Johnson also spoke with Dr. Gagan, who described Sigal's presentation as "a mess," and noted that he demonstrated "some paranoia" during their first meeting on September 17, 2013. (*Id.*) Based on the symptoms of paranoia, Dr. Gagan updated her previous diagnosis of "Bipolar Disorder, most recent episode depressed, severe" to include "psychotic features." (Dkt. No. 52-6 at 476.) Based on these discussions and her review of Sigal's documentation, Dr. Johnson concluded that Sigal's evidence did not support a functional limitation from bipolar disorder beyond June 20, 2013. (Pl. CSOF ¶ 276.)

MetLife faxed Dr. Johnson's report to Drs. Gagan and Kiblitsky on December 6, 2013, and requested that they respond by December 20.  (Pl. CSOF ¶ 285.)  It also sent Sigal a letter informing him of the December 20 deadline.  (Pl. CSOF ¶ 287.)  Although neither doctor responded to MetLife by December 20, Sigal requested that day that MetLife resend Dr. Johnson's report to Dr. Gagan.  (Pl. CSOF ¶ 289.)  Consequently, MetLife re-faxed the report to Dr. Gagan, and requested that she contact MetLife by December 23 if she planned to respond to the report.  (Pl. CSOF ¶¶ 291–93.)  Although MetLife confirmed on December 23 that Dr. Gagan received its fax, she did not contact MetLife nor did she request extra time to respond.  (Pl. CSOF ¶¶ 292, 295–97.)  By letter dated December 20, 2013, MetLife informed Sigal that its initial adverse determination was upheld on appeal.  (Pl. CSOF ¶ 298.)

Following exhaustion of the administrative appeals process, Sigal filed this suit in May 2016, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), alleging that he was wrongfully denied LTD benefits under the Plan and seeking to recover withheld benefits and attorney's fees and costs.  (Dkt. No 1 ¶¶ 166–68.)  The parties filed cross-motions for summary judgment.  (Dkt. Nos. 51, 60.)

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250–51). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

### III.     Discussion

"Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) of ERISA provides that a 'civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 479–80 (S.D.N.Y. 2015) (alterations in original) (quoting 29 U.S.C. § 1132(a)(1)(B)). In order to establish his entitlement to benefits, a plaintiff must "prov[e] by a preponderance of the evidence that he is totally disabled within the meaning of the plan." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). Before turning to the question whether Sigal's benefits were wrongfully terminated, however, the Court must first decide what deference, if any, is due to MetLife's decision as Plan Administrator.

### A.     Standard of Review for Administrator's Benefits Denial

"[A] denial of benefits challenged under [ERISA § 502(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Krauss v.*

*Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (alterations in original) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). "If the [administrator] establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard." *Id.* In determining whether the plan delegates such discretionary authority to the administrator, "[a]mbiguities are construed in favor of the plan beneficiary." *Id.*

The parties dispute whether the Plan accords MetLife discretionary authority, and therefore they disagree as to which standard of review—arbitrary and capricious or *de novo*—is appropriate. The relevant documents here are contained in a booklet entitled "Your Benefit Plan," which includes a 44-page "Certificate of Insurance" (Dkt. No. 52-1 at 1–47), followed by a page that states, "THIS IS THE END OF THE CERTIFICATE. THE FOLLOWING IS ADDITIONAL INFORMATION." (Dkt. No. 52-1 at 47.) As promised, four pages of "additional information" come next, punctuated by another page advising that "THE FOLLOWING IS ADDITIONAL INFORMATION." (Dkt. No. 52-1 at 52.) The last four pages of the booklet contain the additional "Additional Information." This second section of "Additional Information" contains the only potential delegation of discretionary authority to MetLife, which states, under the subtitle "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries":

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.

(Dkt. No. 52-1 at 55.)

MetLife claims that the above-quoted text provides it with discretionary authority "to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." (Dkt. 56 at 19; Dkt. No. 52-1 at 55.) Sigal responds that

this language is not actually incorporated into the Plan's terms because it is contained in only the "Summary Plan Description" ("SPD")—a statutorily required disclosure that ERISA fiduciaries must provide to plan beneficiaries and participants.  (Dkt. No. 63 at 7–8 & n.2.)  Relying on the Supreme Court's decision in *CIGNA Corp. v. Amara*, he contends that MetLife's decision is not entitled to deference on the basis of the SPD unless the Plan itself also contains or incorporates a grant of discretionary authority.  *See* 563 U.S. 421, 438 (2011) ("[S]ummary documents, important as they are, provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B).").

Consequently, the parties proceed to argue, with single-minded focus, over whether these two sections of "Additional Information" constitute an SPD.  (*See, e.g.*, Dkt. No. 72 at 4–7; Dkt. No. 63 at 7–9.)  Although cases dealing with Summary Plan Descriptions are instructive here, the question whether the "Additional Information" sections are in fact an SPD is a red herring: Instead, what matters is whether the Plan's language evinces a clear intent to confer discretionary authority on the Administrator.  *See Hamill v. Prudential Ins. Co. of Am.*, No. 11 Civ. 1464, 2012 WL 6757211, at *9 (E.D.N.Y. Sept. 28, 2012), *report and recommendation adopted*, No. 11 Civ. 1464, 2013 WL 27548 (E.D.N.Y. Jan. 2, 2013).  MetLife is entitled to deferential review only if it can "demonstrate that the [Additional Information] is part of the Plan, for example, by the [Additional Information section] clearly stating on its face that it is part of the Plan."  *See Durham v. Prudential Ins. Co. of Am.*, 890 F. Supp. 2d 390, 395 (S.D.N.Y. Aug. 28, 2012).  As in past cases about SPDs, the burden here is on the Administrator to prove that the language in question is part of the plan, *see id.*, and the Court must construe any ambiguities "in favor of the plan beneficiary," *Krauss*, 517 F.3d at 622.

MetLife has failed to carry its burden to demonstrate that the "Additional Information" sections—and thus the requisite grant of discretionary authority—were actually incorporated into the Plan. When interpreting an ERISA plan, courts must apply "[o]rdinary principles of contract interpretation." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013). Thus, "[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent'" if the words of the plan do not speak clearly. *Id.* (quoting *Firestone Tire & Rubber*, 489 U.S. at 113). When interpreting a contract, courts must give "the words and phrases used by the parties . . . their plain meaning." *Brooke Grp. Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (1996); *see also Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 118 (S.D.N.Y. 2016) ("[C]ourts apply traditional principles of contract interpretation" and "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." (quoting *Neuroaxis Neurosurgical Assoc., PC v. Costco Wholesale Co.*, 919 F. Supp. 2d 345, 352 (S.D.N.Y. 2013)). Here, the Certificate, which both parties agree makes up part of the contract, contains a clause subtitled "Entire Contract" that provides: "the *entire contract* . . . is made up of the following: 1. the Group Policy and its Exhibits, which include the certificate(s); 2. the Policyholder's application; and 3. any amendments and/or endorsements to the Group Policy." (Dkt. No. 52-1 at 45 (emphasis added).) The last page of the Certificate clearly identifies the "end of the Certificate," and states that "additional information" will follow. (Dkt. No. 52-1 at 47.) The plain meaning of the phrase "additional information" suggests content that is ancillary and perhaps even superfluous to the contract itself.

Moreover, the last page of the Certificate does not contain any of the categories of contractual terms set out in the "entire contract" clause, which otherwise might have indicated an

intent to incorporate the additional information into the contract (e.g., as an "Exhibit," "amendment," or even perhaps "Addendum"[6]). In fact, the presence of the "entire contract" clause demonstrates that MetLife knew how to clearly incorporate extra information into the contract, yet it failed to unambiguously incorporate the necessary "discretionary authority" language. *See Hamill*, 2012 WL 6757211, at *9 ("[T]he SPD, which was explicitly not included as part of the Plan, demonstrates that [the insurer] knew how to draft the language necessary to confer discretionary authority to itself."). And as Sigal correctly notes, the fact that the "Additional Information" section "is contained in the same bound booklet as the Group Insurance Certificate" is not independently sufficient to establish that the parties intended to integrate it into the contract. *Durham*, 890 F. Supp. 2d at 395.

In support of its argument that the "additional information" is part of the Plan contract, MetLife relies on a long list of cases, mostly from other circuits, holding that it is permissible for a single document to serve as both the Plan contract and the SPD. (*See* Dkt. No. 72 at 6.) It may very well be true, as all of the cases cited by Defendant indicate, that "an SPD can function as a written [plan] instrument in the absence of a separate written instrument." *Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340, 344–345 & n.3 (5th Cir. 2017) (collecting cases). But again, regardless of whether the "additional information" is an SPD or just additional information of a different sort, MetLife has the burden to demonstrate that this information was explicitly incorporated into the contract. Unlike in *Rhea* and the cases it cites, MetLife cannot contend that there is no "separate written instrument," *id* at 345, here: The Certificate clearly sets out the boundaries of the "entire contract." (*See* Dkt. No. 52-1 at 45.) MetLife has not carried

---

[6] *See, e.g.*, *Zaks v. Tes Franchising*, No. 01 Civ. 2266, 2004 WL 1553611, at *3 (D. Conn. July 9, 2004) (construing contract terms in light of an "Addendum" signed by both parties).

its burden to "demonstrate that the [Additional Information] is part of the Plan, for example, by [it] clearly stating on its face that it is part of the Plan." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011).

At best, "the Court finds the language of the Plan to be unclear as to whether discretionary authority was intended to be conferred" via incorporation of the "Additional Information" sections. *See Hamill*, 2012 WL 6757211, at *9. Therefore, the Court cannot conclude that such discretion was adequately conferred upon MetLife. Because MetLife has failed to carry its burden to demonstrate that the Plan document clearly bestowed discretionary authority upon it, the Court must review its benefits decision *de novo*.[7]

**B.     Merits of Sigal's Denial-of-Benefits Claim**

To prevail on his claim for benefits, Sigal must demonstrate by "a preponderance of the evidence that he is totally disabled within the meaning of the plan." *See Paese*, 449 F.3d at 441. The Plan defines "Disabled or Disability" to mean "that due to Sickness or as a direct result of accidental injury" the claimant is:

- [R]eceiving Appropriate Care and Treatment and complying with the requirements of such treatment; and . . .

- [Is] unable to earn:

     . . .

  - [M]ore than 80% of [his] Predisability Earnings at [his] Own Occupation from any employer in [his] Local Economy.

---

[7]     Since the Court concludes that *de novo* review is appropriate because the Plan did not adequately confer discretionary authority on MetLife, it need not reach Sigal's alternative argument that MetLife forfeited its entitlement to deferential review due to alleged violations of the Department of Labor's claims-procedure regulations. (*See* Dkt. No. 63 at 9–18.)

(Dkt. No 52-1 at 21.)  Therefore, as all parties agree, at the time Sigal's claim for continuing long-term disability benefits was first denied, he was required to prove that he was incapable of earning more than 80% of his Predisability Earnings at his Own Occupation from any Employer in his Local Economy.  (Dkt No. 56 at 23; Dkt. No. 63 at 18.)

### 1. Initial Benefits Denial

MetLife first denied Sigal's claim for continuing long-term benefits on June 20, 2013. Based on a review of the administrative record before MetLife at that time, the Court concludes that the initial termination of Sigal's benefits was justified as a matter of law.

In deciding whether to extend its approval of Sigal's long-term benefits claim beyond June 20, 2013, MetLife had before it the following evidence: (1) Dr. Kiblitsky's office visit notes from June 28, 2012, to December 28, 2012 (Pl. CSOF ¶ 162); (2) Sigal's January 2013 updated claimant interview with a Psychiatric Claims Specialist (Pl. CSOF ¶ 200, 203); (3) Dr. Kiblitsky's psychiatric questionnaire, received on April 8, 2013 (Pl. CSOF ¶ 215); (4) Independent Physician Consultant Dr. Lee H. Becker's April 23, 2013 report (Dkt. No. 52-10 at 521; Pl. CSOF ¶ 224); and (5) Dr. Kiblitsky's May 9, 2013 fax containing updated medical records (Dkt. No. 52-8 at 497).  Each piece of evidence supports MetLife's initial conclusion that Sigal had not established continuing disability beyond June 20, 2013.

First, Dr. Kiblitsky's office visit notes from June 28, 2012, to December 28, 2012, demonstrate a general improvement in Sigal's symptoms.  With the exception of irritability and occasional apathy, sadness, or "restricted range" of affect (e.g., Dkt. No. 52-12 at 563, 572),[8] his mental status examinations during this period were relatively positive, repeatedly indicating

---

[8]    The Court also notes that, at other points during this period, Sigal's mood was similarly improved.  (Dkt. No. 52-12 at 566 (noting "euthymic" mood).)

normal and appropriate appearance, behavior, and speech, along with "goal directed, organized, logical, [and] linear" thought process, normal and future-oriented thought content, and intact judgment. (Dkt. No. 52-12 at 563, 566, 570, 572; *see also* Dkt. No. 52-2 at 288–89 (summarizing any abnormalities mentioned in Dr. Kiblitsky's office notes).)

Second, Sigal's January 2013 updated claimant interview with MetLife also demonstrated improvement in his symptoms. Although Sigal self-reported a worsening of his mood swings and irritability[9] (Dkt. No. 52-2 at 276–77), and MetLife's Psychiatric Claims Specialist observed a depressed and irritable mood, she also noted that his thought process was linear (albeit slow) and his thought content was "appropriate but brief." (Dkt. No. 52-2 at 279–80.) Ultimately, she was not convinced, on the basis of the interview and her review of Dr. Kiblitsky's documentation, that Sigal was unable to perform the duties of his own occupation. (Dkt. No. 52-2 at 289–90.)

Third, Dr. Kiblitsky's psychiatric questionnaire likewise evidenced an improvement in Sigal's symptoms, although it did list his "return to work" date as "unknown." (Dkt. No. 52-10 at 532.) More specifically, Dr. Kiblitsky gave Sigal a GAF Score of 60-70, which was markedly higher than Dr. Kayne's score of 45 (Pl. CSOF ¶¶ 26, 215), and which indicates only mild symptoms. *See Foreman v. Colvin*, No. 12 Civ. 2120, 2013 WL 3200615, at *1 n.2 (N.D. Ohio June 24, 2013) ("[A] GAF score between 61–70 indicates 'some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g.

---

[9] Although a "subjective [report] of pain is an important factor to be considered in determining disability," *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)), MetLife "was 'not required to accept [plaintiff's] subjective complaints in the absence of objective evidence supporting disability,'" *Ianiello v. Hartford Life & Accident Ins. Co.*, 2012 WL 314872, at *3 (E.D.N.Y. Feb. 1, 2012) (quoting *Tortora v. SBC Commc'ns*, 739 F. Supp. 2d 427, 444 (S.D.N.Y. 2010)).

occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships.'" (quoting *Diagnostic & Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised 2000) ("DSM-IV"))); *see also Hill v. Astrue*, No. 12 Civ. 50, 2013 WL 209647, at *3 (W.D.N.Y. Jan. 17, 2013) (concluding that "a limited ability to perform activities associated with unskilled work . . . is inconsistent with [a] reported GAF score of 70").[10]

Fourth, Dr. Becker's report is likewise consistent with the improvements reflected in Dr. Kiblitsky's records. Based on a review of Sigal's file, Dr. Becker determined that the medical information available did not support "significant, global psychiatric functional limitations to preclude occupational functioning" going forward. (Dkt. No. 52-9 at 510.) He acknowledged Sigal's "self-reported issues with irritability," but found "no indication of significant manic or psychotic behaviors" indicative of "specific and significant impairments" in daily function "due to severe mood disorder symptoms." (Dkt. No. 52-9 at 511.)[11]

---

[10]     The Court acknowledges that "the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders,* the professional standard handbook for mental health diagnosis, has dropped the use of the [GAF] scale." *Mainella v. Colvin*, No. 13 Civ. 2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014). Nonetheless, the Court considers Sigal's GAF scores useful indicators of his treating physicians' opinions about his ability to function at his occupation. *See id.*

[11]     The Court rejects Sigal's contention that Dr. Becker's opinion lacks credibility because he has been financially compensated by MetLife for reviewing a large number of claims. (*See* Dkt. No. 63 at 26.) Sigal has not offered any affirmative evidence that Dr. Becker was unable to provide an independent assessment of the evidence. The Court "cannot conclude that the medical consultant[] harbored a bias simply because [he was] compensated by [the insurance company] for [his] work in connection with this review and past reviews." *Mugan v. Hartford Life Grp. Ins. Co.*, 765 F. Supp. 2d 359, 373 (S.D.N.Y. 2011); *see also Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 366 (E.D.N.Y. 2013) ("That [doctors] were paid for their services does not render their opinions biased in favor of [the insurer].").

The Court also notes that "[s]ince [MetLife] is both the insurer and administrator of the Policy, a conflict of interest exists." *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 405 (S.D.N.Y. 2010). Such a structural "conflict of interest should be dispositive only as a 'tiebreaker,' and is not relevant when the conflicted party's conduct cannot otherwise be

Moreover, the fact that Sigal failed to provide any evidence from Dr. Kiblitsky to cast doubt on Dr. Becker's report further supported MetLife's initial decision to terminate his benefits. *See White v. Verizon Commc'ns, Inc.*, No. 06 Civ. 1536, 2008 WL 5382329, at *4 (N.D.N.Y. Dec. 17, 2008) ("In light of the fact that Plaintiff did not respond to the request for medical information after being given more than three months to do so, the Court finds that MetLife did not act improperly in terminating Plaintiff's benefits" (on arbitrary and capricious review).).[12] Finally, and perhaps most notably, Dr. Kiblitsky's May 9, 2013, fax to MetLife adds only further support to MetLife's initial determination to terminate benefits. (Dkt. No 52-8 at

---

characterized as arbitrary or capricious." *Id.* Here, Sigal does not rely on MetLife's dual role as administrator and payor of benefits in his challenge to MetLife's decision, and even if he did, the Court would likely conclude that the conflict is not entitled to dispositive weight in light of MetLife's "active steps to remove potential bias and to promote the accuracy of its review." *Id.*

[12]     Sigal attempts to rely on MetLife's "MD Guidelines" to prove that his "condition is incompatible" with the "stressful and high-pressure work and . . . long hours" required at his job as a programmer. (Dkt. No. 63 at 21.) The MD Guidelines are a reference guide that MetLife provides its employees "to assist them in reviewing claims for specific medical conditions." (Dkt. No. 63 at 6 n.1.) MetLife moved to strike Sigal's submission of the MD Guidelines for Bipolar Disorder (or alternatively, to file a sur-reply) (Dkt. No. 80), arguing that the Guidelines were impermissible extra-record evidence submitted without a showing of good cause. *See Connors*, 272 F.3d at 135 ("[T]he district court is limited to a review of the evidence in the administrative record absent good cause to consider additional evidence.").

The Court concludes that the MD Guidelines are simply not probative of the relevant inquiry, namely: whether Sigal introduced sufficient evidence to establish that he *himself* was functionally incapacitated by his bipolar disorder. In other words, to succeed on his claim for long-term benefits, Sigal had to provide evidence of his own functional limitations; a diagnosis of bipolar disorder is not sufficient by itself, even if the MD Guidelines recognize that such a diagnosis may be disabling in certain cases. In fact, just as it would be "arbitrary and capricious to deny a plaintiff's disability claim because she cannot prove that she suffers from a specific illness, as opposed to performance limiting symptoms of an unidentified illness," *Dimopoulou*, 162 F. Supp. 3d at 259, a claimant also cannot rely on general information about a specific illness to prove that he is disabled in the absence of specific evidence of performance limiting symptoms.

Because the Court concludes that the MD Guidelines are not probative of Sigal's claim as a matter of law, MetLife's motion to strike or file a sur-reply is denied as moot.

497.)  In that note, she explains that Sigal mostly suffers from "mood instability" and "irritability," but that it is "on the way for him to function better."  (*Id.*)

Sigal does not point to any evidence in the record prior to the June 20, 2013, initial benefits termination from which a reasonable factfinder could conclude that MetLife's decision was unjustified.  Instead, Sigal cherry-picks from the record phrases such as "mood instability" and "difficulty tolerating/communicating with people" in support of his contention that he met his burden by a preponderance of the evidence in June 2013.  (Dkt. No. 63 at 19–21.)  This alone, without more, is not enough to survive summary judgment, even under the *de novo* standard of review.  *See Mood v. Prudential Ins. Co. of Am.,* 379 F. Supp. 2d 267, 281 (E.D.N.Y. 2005) (assuming *de novo* review and granting summary judgment to the administrator because the claimant's medical evidence was "less than compelling").  The fact that Sigal's medical records reflect that he continued to display certain symptoms before June 20, 2013, such as irritability, anger, and isolative behavior (Dkt. No. 52-10 at 531; Dkt. No. 63 at 5), is not sufficient to carry his burden, even if those symptoms are relevant to certain job functions (such as "communicat[ing] and interact[ing] effectively with others." (Dkt. No. 52-2 at 85)).  The ultimate inquiry is whether any of these symptoms remained "performance limiting," *see Dimopoulou v. First Unum Life Ins. Co.*, 162 F. Supp. 3d 250, 259 (S.D.N.Y. 2016), and at this stage of the benefits termination process, Sigal failed to meet his burden to demonstrate that they remained so after June 20, 2013.[13]

MetLife's motion for summary judgment is granted on the question whether its initial benefits termination was justified.

---

[13]     This conclusion is reinforced by the fact that the overwhelming majority of the evidence Sigal cites is drawn from the Maimonides Center's reports, which were not before MetLife during the initial benefit termination decision.  (*See, e.g.*, Dkt. No. 63 at 5.)

### 2. Sigal's Appeal of the Initial Denial

Although the Court grants MetLife's motion for summary judgment as to the initial benefits termination, it must separately evaluate whether, under the *de novo* standard, Sigal's evidence on appeal satisfied his burden to provide disability by a preponderance of the evidence. *See, e.g.*, *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 134, 137 (2d Cir. 2008) (upholding initial denial of benefits, but concluding that the denial of appeal was arbitrary and capricious). The Court concludes that genuine factual disputes remain as to whether MetLife wrongfully denied Sigal's appeal in light of the evidence before it.

In contrast to the evidence considered during his initial benefits termination, Sigal submitted enough evidence during the administrative appeal process to permit a reasonable factfinder to conclude that he established disability by a preponderance of the evidence. Most significantly, in October 2013, Sigal provided a letter from Dr. Gagan and Clinical Social Worker Feldman of the Maimonides Medical Center's Department of Psychology. (Dkt. No. 52-7 at 483.) Dr. Gagan's and Feldman's letter diagnosed Sigal with bipolar disorder, gave him a GAF score of 55,[14] and listed symptoms including depressed mood, markedly diminished interest in almost all activities, sleep problems, psychomotor retardation with episodes of restlessness, loss of energy, and diminished ability to think and concentrate. (Dkt. No. 52-7 at 483; Pl. CSOF ¶ 256.) They concluded that these symptoms caused "clinically significant distress," resulting in "serious impairment in all areas of functioning," and that Sigal would be unable to work for at least six months. (Dkt. No. 52-2 at 483–84.) Furthermore, Dr. Gagan updated her previous diagnosis of "Bipolar Disorder I, most recent episode depressed, severe" to

---

[14] "A GAF score of 55 indicates moderate symptoms or moderate difficulty in social or occupational functioning." *Hickman*, 2014 WL 652545, at *6.

include "psychotic features" after Sigal displayed paranoia at an appointment in September 2013. (Dkt. No. 52-6 at 477.)

In rejecting Sigal's appeal, MetLife relied on the report of another Independent Physician Consultant, Dr. Nicole R. Johnson. (Pl. CSOF ¶¶ 261–62.) Dr. Johnson's report was based on her review of the relevant medical records from Drs. Kiblitsky and Gagan and Ms. Feldman, as well as her conversations with the two doctors. (Dkt. No. 52-6 at 475–76.) She concluded that the medical evidence did not support functional limitation beyond June 20, 2013. (Dkt. No. 52-6 at 476.) She discounted Dr. Gagan's report based on the fact that Sigal "changed mental health providers" only after "Dr. Kiblitsky began to describe [him] as having mild symptoms and improving in function." (*Id.*) She reasoned that the "discrepancy" between Dr. Gagan's and Dr. Kiblitsky's reports "call[ed] into question Mr. Sigal's true presentation and level of function." (*Id.*)

At bottom, the evidence in the record as to the administrative appeal reveals a conflict between "competing physician opinions": those of Dr. Gagan versus those of Dr. Johnson. *O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110, 117 (2d Cir. 2011) (quoting *O'Hara v. Nat'l Union Fire Ins. Co.*, 697 F. Supp. 2d 474, 476 (W.D.N.Y. 2010)). On *de novo* review of a Plan Administrator's decision, such conflicting medical opinions as to whether the claimant is disabled amount to a genuine factual dispute sufficient to preclude summary judgment. *See id.* ("The district court therefore erred when it observed that its 'authority to weigh competing physician opinions . . . and to make findings of fact based on [its] own consideration of the evidence' entitled it to set aside any evidence that would otherwise create a genuine issue of fact." (alterations in original) (quoting *O'Hara*, 697 F. Supp. 2d at 476)); *see also Katzenberg v. First Fortis Life Ins. Co.*, 500 F. Supp. 2d 177, 195 (E.D.N.Y. 2007) ("Even if the opinions of

[the insurer's doctors] were sufficient to sustain defendant's burden upon its motion for summary judgment, plaintiff created a genuine issue of fact by providing several contrary medical opinions.").[15]

On the one hand, it is true, as Sigal contends, that courts sometimes accord greater weight to the opinion of a treating physician, such as Dr. Gagan, who may be more familiar with a patient's medical condition than a doctor who never examined him and who is hired by his adversary, such as Dr. Johnson.[16] *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135–36 (2d Cir. 2001). Moreover, the significance of a treating physician's opinion may be particularly heightened in the context of psychiatric disability. *See Morse v. Corning Inc. Pension Plan for Hourly Employees*, No. 05 Civ. 6318, 2007 WL 610628, at *9 (W.D.N.Y. Feb. 23, 2007). On the other hand, MetLife is correct that it was not *required* to give any special deference to the opinions of any treating physician, *see, e.g.*, *Paese*, 449 F.3d at 442, and that it is permissible to "rely on a medical records review" without "obtain[ing] an independent medical

---

[15]   The Court also notes that Sigal's SSDI claim was approved. (Pl. CSOF ¶¶ 83, 90.) A factfinder would be entitled to "consider[] the [Social Security Administration's] findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the [Administration's] definition of disability may differ from that in the [Plan]." *Paese*, 449 F.3d at 442.

[16]   The Court rejects Sigal's contention that Dr. Johnson's report "hold[s] no evidentiary value." (Dkt. No. 63 at 23.) First, as explained above, *see supra* note 11, the fact that MetLife compensated Dr. Johnson does not render her medical analysis incredible as a matter of law. Second, the record does not support Sigal's contention that Dr. Johnson's opinion should be wholly discounted because she ignored relevant medical evidence. (*See* Dkt. No. 63 at 24.) To the contrary, her report indicates that she "reviewed [his] records . . . and spoke with or attempted to contact his treating physicians." *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 488 (S.D.N.Y. 2015) (rejecting plaintiff's claim that defendant failed to consider relevant evidence). Nor does the record support Sigal's characterization of Dr. Johnson's report as "unsupported and inconsistent with all medical evidence and Dr. Johnson's conversations with Drs. Kiblitsky and Gagan." (Dkt No. 63 at 25.) As explained above, there is evidence in the record, especially from Dr. Kiblitsky, supporting Dr. Johnson's conclusion that Sigal's condition had improved.

evaluation" in assessing Sigal's claim, *Alberigo v. Hartford*, 891 F. Supp. 2d 383, 399 (E.D.N.Y. 2012).[17]  In deciding whether to credit Dr. Gagan's opinion, as a new treating physician, over Dr. Johnson's, a factfinder could consider "multiple factors," including "the length and nature of [the treating provider and plaintiff's] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 289 (E.D.N.Y. 2014) (alterations in original) (second quoting *Connors*, 272 F.3d at 135) (internal quotation marks omitted).

As the Second Circuit has explained, when faced with a conflict between two potentially credible physician's reports, neither party is entitled to summary judgment where, as here, a Plan Administrator's decision is subject to *de novo* review: "Such a credibility determination is appropriate at a trial, but it exceeds the scope of a judge's authority in considering a summary judgment motion.  Absent any indication that Dr. [Gagan's or Dr. Johnson's] opinion is unreliable as a matter of law, the differing opinions of the two doctors present a genuine issue as to the material fact of [Sigal's] medical condition." *Napoli v. First Unum Life Ins. Co.*, 78 F. App'x 787, 789 (2d Cir. 2003).  Therefore, in light of the record, the Court cannot grant summary judgment in favor of either party.

---

[17]        "[MetLife] was not required to employ a physician to conduct an independent psychiatric examination of the plaintiff, although it had the right to do so." *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160, 2007 WL 2844869, at *13 (S.D.N.Y. Sept. 28, 2007).  In the context of psychiatric disability, it may be particularly advisable for an insurer to conduct an independent psychiatric examination, given "the inherent subjectivity of a psychiatric diagnosis." *Morse*, 2007 WL 610628, at *9 (citing *Westphal v. Eastman Kodak Co.*, 2006 WL 1720380, at *4 (W.D.N.Y. 2006)).  The Court agrees with MetLife and the *Gannon* court, however, that a "categorical rule" deeming any decision in a psychiatric case arbitrary and capricious if it is not based on an independent examination would contradict the Supreme Court's rejection of a "treating physician rule" in ERISA cases.  *Gannon*, 2007 WL 2844869, at *13 n.6; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

**IV.    Conclusion**

For the foregoing reasons, MetLife's motion for summary judgment is GRANTED in part and Sigal's cross-motion for summary judgment is DENIED.

The only issue remaining in the case is whether Sigal met his burden of proof at the administrative appeal stage of his continuing claim for benefits beyond June 20, 2013. The parties shall file a joint status letter by March 19, 2018, indicating how they propose to proceed with this case, including whether they consent to a "bench trial on the papers" in which the Court would resolve all factual disputes. *See, e.g.*, *Barbu*, 35 F. Supp. 3d at 279.

The Clerk of Court is directed to close the motions at Docket Numbers 51 and 60.

SO ORDERED.

Dated:  March 5, 2018
        New York, New York

_____
J. PAUL OETKEN
United States District Judge